UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RATIB H. ALKHAWALDEH                    CIVIL ACTION

VERSUS                                  NO. 14-2140

NAIRN CONCRETE                          MAGISTRATE JUDGE
SERVICES, INC.                          WILKINSON

## ORDER AND REASONS ON MOTION

Plaintiff, Ratib H. Alkhawaldeh, alleges that his former employer, Nairn Concrete

Services, Inc. ("Nairn"), violated Title VII, 42 U.S.C. § 2000e(k), by discriminating

against him in actions based on his national origin and religion, specifically Jordanian

Muslim.   He asserts four distinct claims:   (1) hostile work environment, (2)

discriminatory assignment of a job task that was not part of his duties, (3) discriminatory

termination of his employment and (4) termination in retaliation for having complained

about the pre-termination acts of alleged discrimination.  Complaint, Record Doc. No. 1.

This matter was referred to a United States Magistrate Judge for all proceedings and

entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all

parties.  Record Doc. No. 19.

Nairn filed a motion for summary judgment as to all of plaintiff's claims, Record

Doc. No. 27, supported by excerpts from plaintiff's deposition testimony, the affidavit

of Nairn's president, David Pavlovich, and several documentary exhibits.[1]  Nairn also argues that Alkhawaldeh cannot establish a prima facie case of either discrimination or retaliation.  Nairn alternatively contends that, if plaintiff can demonstrate a prima facie case of discrimination based on a hostile work environment, the evidence establishes defendant's Ellerth/Faragher affirmative defense to liability on that claim.  Nairn argues that, if Alkhawaldeh can establish a prima facie case of discrimination based on his job assignments or his termination, defendant had legitimate non-discriminatory reasons for those decisions and plaintiff cannot show that these reasons were pretextual.  As to plaintiff's retaliation claim, if plaintiff can establish a prima facie case, Nairn contends that he cannot carry his ultimate burden to show that retaliation was the but-for cause of his termination.  Finally, Nairn asserts that plaintiff's discrimination claims based on events that occurred more than 300 days before he filed his charge with the Equal Employment Opportunity Commission, or before January 25, 2011, are time-barred for failure to exhaust his administrative remedies.

Alkhawaldeh received leave to file a memorandum in opposition to Nairn's summary judgment motion that was untimely and in excess of the court's page limits.  Record Doc. Nos. 31, 34, 35.  He argues that material facts are in dispute as to each of his claims.  He also contends that his discrimination claims based on events that occurred

---

[1]None of the documentary exhibits submitted by either party is verified, but neither party objects to any exhibit on that basis.  Accordingly, I have assumed that all exhibits are authentic.

before January 25, 2011, are not barred because those events comprise a continuing violation with events after that date.

Defendant received leave to file a reply memorandum. Record Doc. Nos. 34, 38. The reply contains four pages of <u>new</u> exhibits that were not already in the record. These new exhibits consist of three additional pages from plaintiff's deposition transcript, Defendant's Exh. 1 to reply memorandum, Record Doc. No. 38-1 at pp. 2, 9, 20 (pp. 38, 54 and 96 of the transcript); and a list of "Loader Man Duites [sic]," Defendant's Exh. 2 to reply memorandum, Record Doc. No. 38-2. The court has not considered these exhibits because plaintiff had no opportunity to respond to them.[2] Even if the court considered the new exhibits, they would not change the outcome of this decision.

Having considered the complaint, the record, the arguments of the parties and the applicable law, IT IS ORDERED that defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART as follows.

I.   FACTS

The following material facts are accepted as undisputed solely for purposes of this summary judgment motion. These facts are based on the competent summary judgment evidence, consisting primarily of plaintiff's deposition testimony, Defendant's Exhs. 1

---

[2]The court notes, however, that the list of "Loader Man Duites [sic]," which was apparently created by defendant, raises credibility questions that cannot be resolved on summary judgment because there is no evidence in the record about when it was created, who created it or where it came from.

and 4, Record Doc. Nos. 27-4 and 27-7, and the affidavit of Nairn's president, David Pavlovich.  Defendant's Exh. 2.

Plaintiff is a Muslim from Jordan.  He was employed by Nairn from 2009 to September 29, 2011, as a front end loader operator.  Fred Klotz became Nairn's operations manager in the spring of 2010.  Before that date, plaintiff received good performance reviews from three different supervisors.  Plaintiff's Exhs. 1,[3] 2, 3.

On April 1, 2010, Klotz approached plaintiff and asked where he was from.  Klotz told Alkhawaldeh that he thought plaintiff was Mexican and asked who had helped plaintiff to get his job.  Although Klotz said nothing derogatory about Jordanians, Arabs or Muslims, Alkhawaldeh was angered by the comments and thought that Klotz was trying to provoke him.  Plaintiff reported the conversation to an unnamed supervisor.  This conversation had no impact on plaintiff's ability to do his job.  Defendant's Exh. 1, deposition of Ratib Alkhawaldeh, at pp. 48-49, 51, 53.

Two weeks later, Klotz asked Alkhawaldeh if he was a Muslim.  When plaintiff responded affirmatively, Klotz said he did not like working with Arabs or Muslims.  Alkhawaldeh reported these remarks to the mechanic supervisor, Ralph DeMatteo, who was a friend of Klotz's and whom plaintiff trusted.  Id. at p. 53; see also Plaintiff's

---

[3]Plaintiff's Exh. 1, signed by mechanic supervisor Ralph DeMatteo, is undated, but defendant does not dispute plaintiff's contention that it was rendered before Klotz became operations manager.

Exh. 1, undated employee performance review of plaintiff signed by DeMatteo as manager.

Klotz approached Alkhawaldeh again about three weeks later.  Klotz said he did not like plaintiff because plaintiff is an Arab and a Muslim.  Alkhawaldeh reported this conversation to his immediate supervisor, Marcellin Billiott, known as "Chubby," and to DeMatteo.  Plaintiff testified that his work performance did not suffer as a result of the second or third conversations.  Id. at pp. 56-58.  There is no evidence that Nairn took any action in response to plaintiff's reporting of these three conversations that occurred between April 1 and about the first week of May, 2010.

About three months later, on a Friday in August 2010, Klotz called Alkhawaldeh into his office.  Klotz closed the door and told plaintiff to sit down.  Klotz typed on his computer, stood up and asked Alkhawaldeh in a loud voice if he knew why Klotz did not like Arabs and Muslims.  Klotz then showed plaintiff a video "of someone with his head cut off."  Alkhawaldeh "felt so badly that this guy [Klotz] is going to kill me or something.  And he continued to say that these are the Muslims, those are the Muslims."  Although Klotz did not specifically threaten plaintiff with violence or touch him, Klotz was standing up and shouting "this is the Muslim."  Alkhawaldeh was frightened that Klotz "was about to do something against me because he physically . . . is bigger than me and I was kind of afraid of him. . . .  [T]he way he was presenting himself  with high and loud voice made me fearful and I had to leave . . . . because he's so close so I just left

5

. . . . After he showed me the video I was very afraid, I ran to Ruby, the secretary, and I told her that he would show me the video and I'm very scared." Id. at pp. 61-63.

Alkhawaldeh immediately reported the incident to Ruby Swilley, Nairn's office manager.  He also reported it to Chubby.  Chubby told plaintiff that he would talk with Klotz.  It was the end of the work day, and Alkhawaldeh left work.  Id. at pp. 63-64.

Plaintiff was scheduled to work on Saturday, the day after the video incident. After telephoning his supervisor for permission, he reported to work about an hour late that day because he had a muscle cramp in the morning.  Id. at p. 74.

In response to plaintiff's complaint about the video incident, Nairn's president, David Pavlovich, called a meeting of all employees the following Monday.  Id. at p. 80; Defendant's Exh. 2, Pavlovich affidavit at ¶ 9.  Pavlovich told the employees at the meeting that Nairn does not discriminate against anyone and that any discrimination was unacceptable.  He ordered Klotz to apologize to plaintiff for Klotz's actions.  Id.  One or two days later, Klotz orally apologized to Alkhawaldeh and gave him a written apology letter.  According to plaintiff, "everyone knew that" Klotz had apologized to him. Defendant's Exh. 1, Alkhawaldeh deposition at pp. 86-87.

After this meeting, Klotz reduced his contact with Alkhawaldeh.  Plaintiff's testimony is not entirely clear about the dates, but the competent evidence is undisputed that Klotz took no further allegedly discriminatory actions for at least three, and possibly as many as seven, months after his apology.  Id. at pp. 87, 93-95.  Alkhawaldeh testified

that, in March 2011, Klotz began blaming him for mistakes in plaintiff's work, such as leaving his machine dirty, and that this type of complaint continued until plaintiff was fired in September 2011. Alkhawaldeh denied that he left his machine dirty. He testified that five other people used his machine at different times after he had cleaned it and that it would be dirty when he returned to work in the morning. Id. at pp. 87-88.

The next incident of which Alkhawaldeh complains occurred when Klotz and DeMatteo said to each other, within plaintiff's hearing, that Arabs and Muslims are stupid people, that Arabs are stupid and are killing each other, and that Arabs and Muslims treat women badly. This overheard conversation occurred three to seven months after the video incident. Plaintiff believed that Klotz and DeMatteo wanted him to hear their conversation and were trying to provoke him to do something wrong so they could fire him. Alkhawaldeh did not pay a lot of attention to the statements and did not respond to them. Id. at pp. 68, 70, 72, 76.

These are the only statements about Arabs and Muslims that plaintiff heard from Klotz and/or DeMatteo, and he heard them only once. Id. at pp. 78-80. He did not report these comments to Pavlovich or Swilley. Id. at pp. 99-100.

Plaintiff felt that Klotz treated him differently from March through May 2011 regarding job duties that Klotz told him to perform, particularly with respect to being told that he had to grease the stacker. However, Alkhawaldeh did not report the different

treatment to anyone.  Id. at pp. 101-02.  He testified that Chubby told Klotz at some unspecified time that greasing the stacker was not plaintiff's responsibility.  Id. at p. 60.

According to Pavlovich, a front end loader operator's duties include greasing the bearings on the stacker and plant.  Pavlovich states that this was a part of a front end loader operator's duties before Klotz was hired, that all front end loader operators are required to perform this task and that Alkhawaldeh was not singled out to perform that job.  The stacker is approximately 40 feet off the ground and is accessed by a six-step ladder and a catwalk with a hand rail and guard.  Greasing the stacker is preventive maintenance that is done once or twice a week and takes approximately ten minutes. Defendant's Exh. 2,  Pavlovich affidavit at ¶¶ 5-8.

Alkhawaldeh testified that greasing the stacker was not part of his job duties, that he did not have the training to do it and that it was routinely performed by mechanic shop personnel before Klotz asked him to do it beginning about June 2011, Defendant's Exh. 1, Alkhawaldeh deposition at pp. 40-41, or as early as March 2011.  Id. at p. 101. For purposes of this motion, this fact dispute between plaintiff's testimony and Pavlovich's affidavit is resolved in favor of plaintiff's testimony that he was not required to perform this task as part of his job duties before March or June 2011.

Alkhawaldeh had an accident with his front end loader in November 2010 that damaged a vehicle owned by Southern Scales & Controls, Inc.  Nairn paid for Southern Scales's property damage.  Defendant's Exh. 2, Pavlovich affidavit, at ¶ 11.

Plaintiff was involved in another accident in April 2011. He backed up his front end loader and collided with a truck owned by David Joseph that was also backing up. Nairn paid for the damage to Joseph's vehicle. Plaintiff was <u>not</u> reprimanded for the accident. <u>Id.</u> at p. 114; Defendant's Exh. 2, Pavlovich affidavit at ¶ 12. A disciplinary warning regarding this accident apparently was in Alkhawaldeh's personnel file, Plaintiff's Exh. 12, but it was never signed by a supervisor nor issued to plaintiff.

A piece of equipment that Nairn rented from Louisiana Rents was damaged by Alkhawaldeh's misuse in May 2011, and Nairn was charged for repairs to the equipment. <u>Id.</u> at ¶ 13. Although plaintiff's counsel denies in his memorandum in opposition to defendant's summary judgment motion that plaintiff misused the equipment, no competent evidence supports his denial.

On July 5, 2011, Klotz gave plaintiff a written warning for "failure to properly maintain equipment under his supervision." Plaintiff's Exh. 14. The disciplinary action notice stated that Nairn was charged $3,500 to repair the bucket of a rented front end loader, which had been used for about one month. The notice says that the rented machine had excessive wear of its bucket blades and had too many idle hours on the engine and was dirty for its age. The warning stated that Alkhawaldeh failed to advise any supervisor of problems with the machine until one day before his regular machine was returned and did not follow instructions on how to scoop material. Plaintiff was told to improve his job performance by operating the front end loader in five specific ways:

9

1.    Operate loader as instructed by supervisor.  "Float" bucket on pavement.
2.    Scoop material as instructed, don't drag blade on ground.
3.    Clean everyday and remove built up concrete.
4.    Shut engine off when not in use.
5.    Do maintenance check every day.

The notice stated that further infractions will result in disciplinary measures, such as suspension without pay and ultimately dismissal.  Plaintiff signed the notice to acknowledge receipt. Id.; Defendant's Exh. 1, plaintiff's deposition at p. 94.

On September 22, 2011, Klotz and DeMatteo called plaintiff into a meeting and told him that he had to grease the stacker in the Nairn plant.  Alkhawaldeh responded that it was not his job.  He said he was not trained for it and was afraid to do it.  DeMatteo then told Klotz that it was "him or Ratib in this company," which the parties interpret as DeMatteo threatening to quit if plaintiff did not perform the task.  After DeMatteo left the meeting, Klotz told plaintiff again that he had to grease the stacker.  Alkhawaldeh again refused and returned to his work.  Id. at pp. 41, 102-03.

On September 29, 2011, Klotz told plaintiff that he was giving plaintiff one more chance and that he must grease the stacker.  Alkhawaldeh refused, stating that it was not his responsibility and that he was afraid to do it.  Klotz then fired him and gave him a written notice of termination, which plaintiff refused to sign. Id. at p. 103; Defendant's Exh. 4, continuation of plaintiff's deposition, at p. 18.

Nairn's Disciplinary Action notice dated September 28, 2011 and its Separation Notice dated September 29, 2011 both state that Alkhawaldeh was fired because of his failure to perform job tasks as agreed to on July 5, 2011.  Defendant's Exh. 5, Separation Notice; Plaintiff's Exh. 11, Disciplinary Action.  The Disciplinary Action states that plaintiff was given a write-up concerning his job performance on July 5, 2011.  Pavlovich avers in his affidavit that plaintiff was terminated based on his recent job performance and his refusal to grease the stackers, which Pavlovich states was a required part of plaintiff's job.  Defendant's Exh. 2, Pavlovich affidavit at ¶ 14.

Alkhawaldeh filed his charge of national origin and religious discrimination and retaliation with the EEOC on November 21, 2011.  He alleged that the violations had occurred between April 1, 2010 and September 28, 2011.  Defendant's Exh. 3.

II.   <u>ANALYSIS</u>

A.   <u>Plaintiff's Exhibits 4, 5, 6, 7 and 8</u>

Nairn objects to the admissibility of plaintiff's Exhibits 4, 5, 6, 7 and 8 submitted in opposition to defendant's summary judgment motion.  Plaintiff's Exhibit 4 is an Investigative Memorandum dated July 18, 2013, to Keith Hill, the Field Director of the EEOC from Hoyt Baugh, the EEOC investigator who handled plaintiff's complaint. Record Doc. No. 35-4.  Plaintiff's Exhibits 5, 6 and 7 are Investigative Notes in which Baugh summarizes his interviews of several witnesses.  Record Doc. Nos. 35-5 through 35-7.  Exhibit 4, Baugh's Investigative Memorandum, contains verbatim recitations of

the same summarized witness statements as in Exhibits 5, 6 and 7.  Plaintiff's Exhibit 8 is the EEOC's determination letter dated August 29, 2013, in which the EEOC found that the record supported "a reasonable cause finding that the Charging Party was subjected to numerous acts of discrimination, and retaliated against, because of his religion and national origin."  Record Doc. No. 35-8 at p. 1.  "Based on the aforementioned evidence, the Commission concludes that there is reason to believe that violations of Title VII have occurred."  The EEOC sought conciliation of plaintiff's claims against Nairn.  Id. at p. 2.  All of these documents appear to have been produced from the EEOC pursuant to a Freedom of Information Act request, as they have a FOIA file number at the bottom.  Alkhawaldeh seeks to introduce these materials into evidence for the truth of the matters asserted in the witness statements, Baugh's factual conclusions and the EEOC's probable cause determination.

Nairn argues that plaintiff's Exhibits 4, 5, 6 and 7 contain Baugh's notes of inadmissible hearsay witness statements, which should not be considered.  Evidence submitted in opposition to a summary judgment motion must be "admissible in evidence."  Fed. R. Civ. P. 56(c)(4).  "Only admissible evidence can be used in opposition to a motion for summary judgment."  Sullivan v. Worley Catastrophe Services, L.L.C., 591 F. App'x 243, 245 n.2 (5th Cir. 2014) (citing Mersch v. City of Dallas, 207 F.3d 732, 734-35 (5th Cir. 2000)).

A witness's statement "is not competent summary judgment evidence . . . [when] it is not sworn to be true and correct before a public notary or stated to be true and correct under penalty of perjury." Smith v. Consol. Recreation & Cmty. Ctr., 131 F. App'x 988, 989-90 (5th Cir. 2005). The Investigative Notes do not contain transcripts of the interviews, but are Baugh's summaries of what the witnesses said. There is no indication in the record that the witnesses whom he interviewed provided either sworn testimony or unsworn statements under penalty of perjury.

The unsworn witness statements contained in plaintiff's Exhibits 4, 5, 6 and 7 are inadmissible hearsay, unless they fall within an exception to the hearsay rule. Fed. R. Evid. 802. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

In arguing for the admissibility of these exhibits, Alkhawaldeh relies on the public records exception to the hearsay rule. Rule 803(8) provides that a record or statement of a public office is not excluded by the rule against hearsay in a civil case, regardless of whether the declarant is available as a witness, if "(A) it sets out: . . . (iii) . . . factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

Plaintiff has not cited any law that authorizes a fact finder in federal court to consider inadmissible hearsay merely because it is contained in an EEOC investigative report.  To the contrary, the Fifth Circuit has held that unsworn statements and an EEOC investigator's notes of his conversation with a witness that were contained in plaintiff's EEOC file are inadmissible because they do not meet the requirements of then-Fed. R. Civ. P. 56(e), now Rule 56(c)(4).  Cruz v. Aramark Servs., 213 F. App'x 329, 332-33 (5th Cir. 2007) (citing Duplantis v. Shell Offshore Inc., 948 F.2d 187, 191 (5th Cir. 1991)); see also Juneau v. Quality Christmas Tree, Ltd., No. H-13-2535, 2014 WL 3796406, at *3 (S.D. Tex. July 30, 2014) (citing Cruz, 213 F. App'x at 332; McClure v. Mexia I.S.D., 750 F.2d 396, 400 (5th Cir. 1985)) ("The EEOC investigator's notes are out-of-court statements offered for the truth of the matter asserted, Fed. R. Evid. 801(c), namely that the investigator accurately recorded [witnesses'] initial explanations for plaintiffs' terminations," and are inadmissible hearsay.).

Inadmissible hearsay fails to create a genuine issue of material fact.  Yancy v. U.S. Airways, Inc., 469 F. App'x 339, 342 n.1 (5th Cir. 2012) (citing Garcia v. Reeves Cnty., 32 F.3d 200, 204 (5th Cir. 1994)); Roberts v. City of Shreveport, 397 F.3d 287, 295 (5th Cir. 2005).  Accordingly, this court has not considered Baugh's summaries of the hearsay statements of witnesses contained in plaintiff's Exhibits 4, 5, 6 and 7.

Nairn admits that plaintiff's Exhibit 8, the EEOC's determination letter, falls within the hearsay exception for public records, but argues that the letter should not be

14

considered by the court under that same rule because it is untrustworthy, unsupported by competent evidence in the summary judgment record and contradicted by the competent evidence in the summary judgment record.  Plaintiff argues that the letter and Baugh's Investigative Memorandum should be admitted under Smith v. Universal Servs., Inc., 454 F.2d 154, 157 (5th Cir. 1972).

> Smith held that an EEOC investigative report, which consisted of a brief review of the facts developed in the EEOC's investigation and the EEOC's finding of probable cause, was admissible under the business records exception to the hearsay rule.  The plaintiffs' reliance on Smith is misplaced.  While the EEOC report is admissible, it "is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial."  More importantly, while the EEOC report may fall within the business records hearsay exception, the same cannot be said of the entire EEOC file.FN5  The business records hearsay exception applies to the EEOC's report and determination, but it does not apply to the underlying material collected during the EEOC investigation. Rather, the individual evidence contained in the file must be inadmissible [sic] on its own grounds.FN6
>> FN5.  See McClure v. Mexia I.S.D., 750 F.2d 396, 400 (5th Cir. 1985) ("[N]either under the precedents nor under [the business records exception] is the entire EEOC file admissible.").
>> FN6. See id. at 401.

Cruz, 213 F. App'x at 332 (quoting Smith, 454 F.2d at 157) (additional footnotes omitted).

Although the EEOC's determination letters are generally admissible, it is well established that the district court on summary judgment

> is not bound by findings set forth in an EEOC determination letter regarding the plaintiff's claims of discrimination.  Hypolite v. City of

> Houston, [493 F. App'x 597, 603] (5th Cir. . . . 2012) (citing Price v. Fed.
> Express Corp., 283 F.3d 715, 725 (5th Cir. 2002)).  The court, however, is
> "required to take an EEOC investigative report into consideration" because
> the "failure to do so would be 'wasteful and unnecessary.'"  Price, 283 F.3d
> at 725 (quoting Smith v. Universal Servs., Inc., 454 F.2d 154, 157 (5th Cir.
> 1972)).  The EEOC's findings of discrimination are "not dispositive" in
> later discrimination suits.  Id. (addressing racial discrimination).  "Despite
> an earlier positive finding of discrimination by the EEOC, [the Fifth Circuit
> has] held in subsequent suits that the plaintiff was not discriminated against
> by his or her employer."  Id.; see also Odom v. Frank, 3 F.3d 839, 843 (5th
> Cir. 1993) (holding that district court's finding that plaintiff was
> discriminated against was clearly erroneous, despite EEOC's conclusion
> that plaintiff had been discriminated against), overruled on other grounds
> by Moss v. BMC Software, Inc., 610 F.3d 917, 923 (5th Cir. 2010); cf.
> Smith, 454 F.2d at 157 (stating that subsequent civil litigation is a de novo
> proceeding, "completely separate from the actions of the EEOC").

Sellers v. BNSF Ry., No. 1:11-CV-190, 2013 WL 1181458, at *5 (E.D. Tex. Mar. 18,

2013); see also Autry v. Ft. Bend Indep. Sch. Dist., 704 F.3d 344, 348 n.12 (5th Cir.

2013) (citing Cruz, 213 F. App'x at 329; Wright v. Columbia Women & Children's

Hosp., 34 F. App'x 151 (5th Cir. 2002)) (EEOC's determination that defendant had

violated Title VII was "insufficient to create a fact issue for trial, as it is relies on hearsay

and is plainly contradicted by the competent summary judgment evidence.").

The EEOC's determination letter is presumptively admissible, but must be

evaluated under Fed. R. Evid. 803(8)(B).  That rule

> creates a rebuttable presumption that reports prepared by government
> officials–including opinions and conclusions contained in such reports–are
> admissible as exceptions to the hearsay rule.  A party may overcome this
> presumption by affirmatively demonstrating that the report lacks
> trustworthiness.  To make a trustworthiness determination, courts must
> evaluate the report's reliability by focusing upon the methodology behind

the report rather than upon its findings and conclusions. Consequently, the party opposing the admissibility of a government report must demonstrate that it was compiled utilizing methods that cannot be relied upon; general complaints that the report is incomplete or inaccurate go to the weight afforded the report rather than to its admissibility.

Eason v. Fleming Cos., 4 F.3d 989, 1993 WL 13015208, at *3 (5th Cir. 1993) (citing

Moss v. Ole S. Real Estate, Inc., 933 F.2d 1300, 1305, 1307-08 (5th Cir. 1991); United

States v. Puente, 826 F.2d 1415, 1418 (5th Cir. 1987)).

The EEOC's determination is based on Baugh's Investigative Memorandum, which contains his summaries of witness interviews, his interpretation of documents in plaintiff's employment file and his fact findings regarding Nairn's asserted nondiscriminatory and nonretaliatory reasons for its actions. I find that the methodology behind the determination letter and investigative memorandum is trustworthy enough for these documents to be admitted.

The memorandum before me contains redactions, including large sections headed "Recommendation," "Credibility Assessment" and "Analysis" and several smaller redactions from the "Background" section. There is also a page missing following the heading "Elements of Proof," which would have been page 16 of 234, according to the page numbering at the bottom of the memorandum. See Record Doc. No. 35-4 at p. 7 (marked as p. 15 of 234) and p. 8 (marked as p. 17 of 234). To some extent, the Investigative Memorandum is based on hearsay witness statements. However, the incompleteness of the memorandum in these respects goes to the weight that should be

afforded the report, rather than to its admissibility, Eason, 1993 WL 13015208, at *3, and does not affect its overall trustworthiness.

As discussed below, plaintiff's hostile work environment claims based on events before January 25, 2011, are part of a continuing violation and are not time-barred. Especially when viewed in light of the outrageous incident during which Klotz showed Alkhawaldeh a horrific video and raged against all Muslims, the determination letter's conclusions that Alkhawaldeh "endured numerous insulting and offensive comments insinuating that all Muslims, Arabs and people from the Middle East were barbarians, terrorists and murderers" is amply supported by the evidence before Baugh and the admissible evidence before this court. Accordingly, I find that the determination letter and investigative memorandum are admissible.

B.    Standards of Review for Motion for Summary Judgment

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

(1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

18

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> (2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
> (3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.
> (4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

19

(1986).  No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the

complaint."'" <u>Nat'l Ass'n of Gov't Employees</u>, 40 F.3d at 713 (quoting <u>Anderson</u>, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in <u>any</u> case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); <u>accord</u> <u>Duron v. Albertson's LLC</u>, 560 F.3d 288, 291 (5th Cir. 2009).

C.    <u>Plaintiff Alleges a Continuing Violation</u>

A plaintiff who alleges employment discrimination or retaliation must file a timely charge with the EEOC.  "Title VII requires employees to exhaust their administrative remedies before seeking judicial relief.  Private sector employees must satisfy this requirement by filing an administrative charge with the EEOC." <u>McClain v. Lufkin Indus., Inc.</u>, 519 F.3d 264, 273 (5th Cir. 2008) (citation omitted).  The filing of an EEOC charge within 300 days of the allegedly discriminatory or retaliatory action is a prerequisite to filing suit in federal court in a deferral state like Louisiana. <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 109 (2002); <u>Garrett v. Judson Indep. Sch. Dist.</u>, 299 F. App'x 337, 344 (5th Cir. 2008).  Failure to comply with this requirement mandates dismissal of the unexhausted claim.

Alkhawaldeh filed his charge of discrimination and retaliation on November 21, 2011.   Defendant's Exh. 3.   By law, the charge could only encompass events that occurred within 300 days before the filing date, i.e., those that occurred after January 25, 2011, unless some type of equitable tolling applies.   More than 300 days have passed since the allegedly discriminatory events that took place before January 25, 2011, so that Alkhawaldeh could not now file a timely EEOC charge regarding those events.   His failure to file a charge within the 300-day limitations period concerning events that occurred before January 25, 2011, requires dismissal of his claims in this court based on those events as time-barred.   Morgan, 536 U.S. at 113; Carter v. Target Corp., 541 F. App'x 413, 417, 419 (5th Cir. 2013).

However, plaintiff argues that his claims based on events before January 25, 2011, constitute a continuing violation with events after that date.   "'[T]he continuing violation doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation.'"   Tillman v. S. Wood Preserving of Hattiesburg, Inc., 377 F. App'x 346, 349-50 (5th Cir. 2010) (quoting Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 352 (5th Cir. 2001)).

> This "continuing violation" doctrine is limited in three ways.   First, the plaintiff must demonstrate that the "separate acts" are related, or else there is no single violation that encompasses the earlier acts.   Second, the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to

it, precluding liability for preceding acts outside the filing window.  Third, the continuing violation doctrine is tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."

Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 328 (5th Cir. 2009) (quoting Morgan, 536 U.S. at 118, 120) (internal quotation omitted).

The Fifth Circuit

has looked to at least three factors in determining whether acts are sufficiently related to constitute a continuing violation:  (1) whether the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation; (2) whether the acts are in the nature of recurring events, or are more in the nature of isolated events; and (3) whether the act or acts have the degree of permanence that should alert an employee to assert his rights.

Butler v. MBNA Tech., Inc., 111 F. App'x 230, 232-33 (5th Cir. 2004) (citing Huckabay v. Moore, 142 F.3d 233, 239 (5th Cir. 1998)).

Alkhawaldeh alleges four discriminatory incidents in 2010, including one of extreme severity.  First, Klotz approached plaintiff on April 1, 2010, and asked where he was from.  Klotz said he thought plaintiff was Mexican and asked who had helped plaintiff to get his job.  Although Klotz did not mention Jordanians, Arabs or Muslims, this comment, when viewed in light of subsequent events, can be seen as an early indicator that Klotz tends to discriminate based on a person's national origin.

Three directly discriminatory incidents definitely occurred in 2010.  In mid-April, Klotz told Alkhawaldeh that he did not like working with Arabs or Muslims.  Three

weeks later, Klotz said he did not like plaintiff because plaintiff is an Arab and a Muslim. About three months later, in August 2010, Klotz showed plaintiff a horrific video of a beheading, during which Klotz repeatedly said, "These are the Muslims," in a physically intimidating manner.

After employer intervention and a compelled apology of unknown content from Klotz, no further religious or national origin-based comments occurred until three to seven months later when plaintiff overheard Klotz and DeMatteo saying that Arabs and Muslims are stupid, are killing each other and treat women badly. It is unclear on the current record whether this conversation occurred before or after January 25, 2011. For purposes of plaintiff's continuing violation argument and under the summary judgment legal standard, the court resolves the ambiguity in plaintiff's favor and assumes that this conversation occurred after January 25, 2011 and within the limitations period.

The remaining incidents on which Alkhawaldeh bases his hostile environment claims occurred in and after March 2011. None of these incidents included any expressed national origin- or religion-based comments. Rather, they consisted of orders by Klotz and/or DeMatteo and disciplinary warnings to plaintiff regarding his work tasks, such as greasing the stacker and taking care of his machine. Alkhawaldeh alleges that Klotz and/or DeMatteo had discriminatory motives for these actions.

As to the incidents from April to August 2010, I find that Alkhawaldeh has borne his burden to show a continuing violation with the incidents within the limitations period.

24

The first factor of the <u>Huckabay</u> test is met.  The separate acts in 2010 are sufficiently related to each other and to the overheard conversation between Klotz and DeMatteo in 2011, in that each one included specific, national origin- or religion-based comments by Klotz.  Given the nature of the comments, including especially the severest incident involving the beheading video, I cannot conclude that the three conversations in 2010 were unrelated to the events that began in March 2011, when Klotz criticized plaintiff's work performance for picayune and disputed reasons and/or assigned him tasks that he did not want to perform, all of which a reasonable jury could conclude were mere pretexts for Klotz's previously established, clearly discriminatory attitudes towards plaintiff and/or retaliation for the compelled apology.

The second factor of the <u>Huckabay</u> test is also met.  The comments made directly to Alkhawaldeh in April, May and August 2010 and the overheard conversation between Klotz and DeMatteo that presumably occurred after January 25, 2011, are in the nature of recurring events.  These four events, all emanating from Klotz, who had blatantly demonstrated a firmly held discriminatory attitude toward plaintiff, are sufficiently related to form a recurring pattern and support the second prong of a continuing violation.

The third factor also supports a finding of a continuing violation.  "'The core idea [of the continuing violation theory] is that equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil

rights action are or should be apparent to a reasonably prudent person similarly situated.'" Roberts v. Unitrin Specialty Lines Ins. Co., 405 F. App'x 874, 877 (5th Cir. 2010) (quoting Glass v. Petro-Tex Chem. Corp., 757 F.2d 1554, 1560-61 (5th Cir. 1985)).  "'The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'" Id. (quoting Glass, 757 F.2d at 1561).

I find that the three incidents of national origin- and religion-based, derogatory comments by Klotz in 2010, outside the limitations period, put plaintiff on notice that the harassment was an ongoing thing and that his rights had been violated. Butler, 111 F. App'x at 234 (citing Celestine, 266 F.3d at 344). However, Alkhawaldeh acted promptly to report these incidents to other supervisors and Nairn did nothing until after the highly offensive and disturbing video incident, when Pavlovich forced Klotz to apologize.  A reasonable factfinder could conclude that Alkhawaldeh accepted the apology and thought the harassment was over, even when Klotz and DeMatteo had their conversation about "stupid" Arabs and Muslims some months later, and plaintiff did not realize that the harassment was continuing or that Nairn's actions had been insufficient to curb it until later in 2011.  While intervening action by Nairn arguably severed the three acts in 2010 from those that occurred after January 25, 2011, the intervention apparently was insufficient to stop the discrimination, as evidenced by the overheard conversation between Klotz and DeMatteo, DeMatteo's comment that it was "either him or [plaintiff] in this company," and the arguably pretextual orders and disciplinary actions that Klotz

26

took against Alkhawaldeh in 2011, all of which a reasonable factfinder could view as evidence of ongoing discrimination.

The evidence of a continuing hostile work environment after January 25, 2011, that was related to the earlier incidents and formed a recurring pattern with them, is sufficient to find a continuing violation.  Accordingly, plaintiff's failure to exhaust his administrative remedies in 2010 does <u>not</u> bar his claims based on those earlier events.

D.    Evaluation of Plaintiff's Four (4) Claims

1.    Discrimination claim related to changes in work responsibilities

To the extent that Alkhawaldeh complains that the change in his work responsibilities after March or June 2011 and the written warning he received on July 5, 2011, were discrete acts of religious or national origin discrimination, as opposed to part of an ongoing hostile work environment, Nairn argues that he cannot establish a prima facie case because he cannot show that he suffered an adverse employment action.

In a case involving workplace rule violations,

[plaintiff] can establish a prima facie case for discrimination if he can show "that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." If a prima facie case for discrimination can be established, then the burden shifts to the [defendant] to rebut [plaintiff's] case by articulating a legitimate, nondiscriminatory reason for his termination [or other adverse employment action].  If the [defendant] present[s] such a reason, then the burden shifts back to [plaintiff] to show that the [defendant's] reasons for [the adverse employment action] are not

true, but are mere pretexts for discrimination, or that the reasons are true,
but his [protected characteristic] was a motivating factor.

Jackson v. Dallas Cnty. Juvenile Dep't, 288 F. App'x 909, 911 (5th Cir. 2008) (quoting

Bryan v. McKinsey & Co., 375 F.3d 358, 360 (5th Cir. 2004)) (citing McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802, 804-05 (1973)).

As to the third prong of a prima facie case,

adverse employment actions consist of 'ultimate employment decisions'
such as hiring, firing, demoting, promoting, granting leave, and
compensating.  [A]n employment action that does not affect job duties,
compensation, or benefits is not an adverse employment action.
          . . . .
     This court has recognized that . . . a change in work schedule and
request that an employee perform two additional tasks did not rise to the
level of an adverse employment action . . . .   Other circuits similarly agree
that "a mere inconvenience or an alteration of job responsibilities" will not
suffice. . . .
     This does not mean that a change in or loss of job responsibilities
can never form the basis of an actionable discrimination claim, however.
In certain instances, a change in or loss of job responsibilities–similar to the
transfer and reassignment contexts–may be so significant and material that
it rises to the level of an adverse employment action.

Thompson v. City of Waco, 764 F.3d 500, (5th Cir. 2014) (quotations and citations

omitted).

In the instant case, Klotz's orders to Alkhawaldeh that greasing the stacker was

part of his job duties do not rise to the level of a significant and material job change.

Pavlovich's affidavit establishes that this is a ten-minute task, done once or twice a week.

The assignment of this task was not an adverse employment action as a matter of law.

It is also well established that disciplinary action which does not result in a demotion or loss of pay is not an ultimate employment decision.  King v. Louisiana, 294 F. App'x 77, 85-86 (5th Cir. 2008); Ellis, 246 F. App'x at 870-71 (citing Washington v. Veneman, 109 F. App'x 685, 689 (5th Cir. 2004)); Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir. 2000); Burgess v. Cleco Corp., No. 11-1704, 2013 WL 673481, at *6 (W.D. La. Feb. 22, 2013), aff'd, 539 F. App'x 454 (5th Cir. 2013); Montgomery v. Sears Roebuck & Co., 720 F. Supp. 2d 738, 744-45 (W.D. La. 2010).

Thus, plaintiff has not shown that he suffered an adverse employment action and cannot establish a prima facie case of discrimination based on being ordered to grease the stacker or receiving the written warning on July 5, 2011.  Nairn's summary judgment motion is therefore granted in part insofar as it seeks dismissal of that single, discrete claim.  However, the motion papers create a close question as to plaintiff's remaining three claims, which I conclude should not be dismissed on summary judgment and require trial for the following reasons.

2.      Hostile work environment claim

"The creation of a hostile work environment through harassment . . . is a form of proscribed discrimination" under Title VII.  Vance v. Ball State Univ., 133 S. Ct. 2434, 2455 (2013) (Thomas, J., concurring) (citations omitted).  To establish a prima facie case of a hostile work environment, Alkhawaldeh must show that

> (1) [he] belongs to a protected group; (2) [he] was subjected
> to unwelcome harassment; (3) the harassment complained of
> was based on [a prohibited ground]; (4) the harassment
> complained of affected a term, condition, or privilege of
> employment; [and] (5) the employer knew or should have
> known of the harassment in question and failed to take
> prompt remedial action.

Mitchell v. Snow, 326 F. App'x 852, 856-57 (5th Cir. 2009) (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)).

"'[W]here the harassment is allegedly committed by a supervisor with immediate or successively higher authority, the plaintiff employee needs to satisfy only the first four of the elements listed above.'"  Parker v. La. Dep't of Special Educ., 323 F. App'x 321, 325 (5th Cir. 2009) (quoting Celestine, 266 F.3d at 353 (5th Cir. 2001)); accord Equal Emp'mt Opportunity Comm'n v. Boh Bros. Constr. Co., 731 F.3d 444, 452-53 (5th Cir. 2013) (citing Vance, 133 S. Ct. at 2439).

"If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."  Id. at 452.  However, if no tangible employment action is taken, the employer will have the opportunity to prove its affirmative Ellerth/Faragher

defense.  Id. (citing Vance, 133 S. Ct. at 2439); see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).

Tangible employment actions are those that "effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Vance, 133 S. Ct. at 2443 (quotation omitted).

Nairn argues that Alkhawaldeh cannot establish a prima facie case of a hostile work environment, even if the events of 2010 are included in the analysis, because he cannot prove that the harassment was severe or pervasive enough to affect a term, condition or privilege of his employment.  Alternatively, if the court finds that the evidence supports a prima facie case, Nairn contends that the evidence establishes its Ellerth/Faragher affirmative defense to liability.

The fourth prong of a prima facie case is whether the conduct of plaintiff's supervisors was so "severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (emphasis added).  To determine whether harassment meets this standard, the court considers "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating (or whether it is a mere offensive utterance), and whether it unreasonably interferes with the victim's work performance."  Id.  In addition, "the conduct must be both objectively offensive, meaning that a reasonable person would

find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." Stewart, 586 F.3d at 330 (quotation omitted).

The conduct about which Alkhawaldeh complains consists of a pattern of harassment that began soon after Klotz was hired, in which Klotz strongly expressed his bigotry and hatred of Muslims, and continuing even after Klotz was compelled to apologize for the extremely offensive and intimidating video incident. The pattern continued with the overheard conversation between Klotz and DeMatteo, in which they said that Arabs and Muslims are stupid people and are killing each other, and Arabs and Muslims treat women badly. Plaintiff also alleges that, beginning in March 2011, Klotz treated him differently regarding his job duties, particularly with respect to being told that he had to grease the stacker, which had not previously been one of his duties, and regarding care of the equipment he used. On July 5, 2011, Klotz gave plaintiff a written warning for failure to properly maintain equipment under his supervision. On September 22 and September 29, 2011, Klotz and DeMatteo again told Alkhawaldeh that he had to grease the stacker. When plaintiff refused on the latter date, he was fired.

When viewed as a whole in the light most favorable to plaintiff, as required on a summary judgment motion, the trier of fact could find that all of the pre-termination events were pretexts for hostile work environment discrimination. The evidence includes Klotz's overtly discriminatory comments in 2010, Alkhawaldeh's good performance evaluations and the lack of any disciplinary action against him before Klotz arrived, the

32

unsigned disciplinary action notice dated April 2011 that was suspiciously in plaintiff's file, the overheard conversation between Klotz and DeMatteo about "stupid" Arabs and Muslims, the picayune nature of some of Klotz's complaints about plaintiff, and plaintiff's testimony that greasing the stacker had never been part of his job duties, which his immediate supervisor had confirmed to Klotz.

The standard for a hostile work environment is whether the conduct was severe or pervasive enough (not, as defendant sometimes argues in its memorandum in support of summary judgment, severe and pervasive) to alter the conditions of plaintiff's employment. The beheading video incident alone was severe enough to meet this standard.

> Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment. . . . [S]everity and pervasiveness are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.

Equal Emp't Opportunity Comm'n v. WC&M Enters., Inc., 496 F.3d 393, 400 (5th Cir. 2007) (quotation omitted). The video in the instant case depicted gruesome events unrelated to the workplace that no employee should be forced by a supervisor to watch. Klotz's behavior, bearing and demeanor toward Alkhawaldeh during the incident were overtly hostile, physically intimidating and deliberately offensive to plaintiff's religion. A reasonable factfinder could also find that the entire pattern of events was pervasive

enough to establish an abusive environment.  Material fact issues exist for trial regarding plaintiff's prima facie case of a hostile work environment.

Because none of the hostile work environment events involved a tangible employment action, Nairn attempts to establish its affirmative Ellerth/Faragher defense to liability, which is a threshold to asserting the defense.  The evidence establishes that the task of greasing the stacker takes about ten minutes twice a week to complete. Klotz's order to Alkhawaldeh to perform this task did not "effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Vance, 133 S. Ct. at 2443.  Likewise, a written warning regarding plaintiff's job deficiencies with instructions on how he should improve his performance is not a tangible employment action.  Stewart v. Mo. Pac. R., 121 F. App'x 558, 562-63 (5th Cir. 2005); Thompson v. Naphcare, Inc., 117 F. App'x 317, 323 (5th Cir. 2004) (citing Messer v. Meno, 130 F.3d 130, 140 (5th Cir. 1997)).  Therefore, Nairn may assert the Ellerth/Faragher defense to liability on plaintiff's hostile work environment claim, both as a component of its summary judgment motion and at trial.

However, this affirmative defense imposes the burden of proof on defendant and requires the employer to show that (1) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the

34

employer to avoid harm or otherwise." <u>Donaldson v. CDB Inc</u>, 335 F. App'x 494, 500

(5th Cir. 2009) (citing <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807).  Defendant

"bears the burden to prove <u>both</u> elements by a preponderance of the evidence."  <u>Boh</u>

<u>Bros.</u>, 731 F.3d at 462.

An employer's usual method of satisfying the first prong of the <u>Ellerth/Faragher</u>

defense is to produce evidence that it had a written anti-discrimination policy.

> "While proof that an employer had promulgated an antiharassment policy
> with complaint procedure is not necessary in every instance as a matter of
> law, the need for a stated policy suitable to the employment circumstances
> may appropriately be addressed in any case when litigating the first element
> of the defense."  Thus, we often look to an employer's policies and
> programs in determining whether it took reasonable measures to prevent
> discriminatory behavior.  Not every policy eliminates liability; generic
> policies that offer no specific complaint procedure may be insufficient to
> satisfy the <u>Ellerth/Faragher</u> defense.

<u>Id.</u> at 462-63 (quoting <u>Ellerth</u>, 524 U.S. at 765)  (additional citations omitted).  The Fifth

Circuit "consider[s] the existence of a written complaint procedure to be an important

variable in the <u>Ellerth/Faragher</u> analysis."  <u>Id.</u> at 464 n.22 (citations omitted).  The lack

of any specific complaint procedure to address harassment or guidelines for investigating

such complaints may make a written policy inadequate to meet the first prong of the

<u>Ellerth/Faragher</u> defense.  <u>Id.</u> at 464.

Nairn has presented no evidence that it had either a written anti-discrimination

policy or a specific procedure for reporting and investigating complaints of harassment.

When Alkhawaldeh complained about the very serious incident of Klotz showing him

the repulsive video and vehemently expressing antipathy to plaintiff's religion, Nairn's

president promptly called a meeting of all employees.  Pavlovich told the employees that

Nairn does not discriminate against anyone and that any discrimination was

unacceptable, but there is no evidence that he described any specific complaint procedure

or that such a procedure existed.  This is similar to the facts in Boh Brothers, in which

defendant's "broad nondiscrimination policy" was found insufficient because it "offered

no specific guidance regarding sexual harassment.  Rather, it offered [only] generic

statements such as . . . '[a]ll working conditions will be maintained in a non-

discriminatory manner,'" id. at 463, and had no specific procedures for making or

investigating a complaint of harassment.  Id. at 464.

      In addition, although Pavlovich ordered Klotz to apologize to plaintiff, material

fact issues remain in dispute whether this action was either reasonable or effective to

correct the harassing behavior.

> "Prompt remedial action" must be reasonably calculated to end the
> harassment.  What constitutes prompt remedial action depends on the facts
> of the case; not every response by an employer will be sufficient to
> discharge its legal duty.  Rather, the employer may be liable despite having
> taken remedial steps if the plaintiff can establish that the employer's
> response was not reasonably calculated to halt the harassment.

Hockman v. Westward Commc'ns, L.L.C., 407 F.3d 317, 329 (5th Cir. 2004) (quotations

and citations omitted).

Nairn has cited no decisions, and my research has located none, in which a mere apology with no other consequences to the alleged harasser, such as a disciplinary suspension or even a warning in his personnel file, was deemed a sufficient corrective measure for egregious harassment. Cf. Boh Bros., 731 F.3d at 465 (plaintiff's "complaint to [his harasser's supervisor] resulted in what the jury reasonably could have viewed as a belated and cursory twenty-minute investigation" of his complaint, with no disciplinary action for the harasser); id. at n.25 (defendant's "investigation pales in comparison to the prompt and effective responses we have noted in other cases") (citing Williams v. Admin. Review Bd., 376 F.3d 471, 479 (5th Cir. 2004) (When whistleblowers complained of a hostile work environment, the employer "promptly assembled an investigative team to look into the alleged hostilities and offered recommendations on how the problem might be solved.  After the investigative team completed its report, [defendant] shut down the . . . program and required the entire staff to complete forty hours of training in effective human interaction and teamwork."); Moayedi v. Compaq Computer Corp., 98 F. App'x 335, 338 (5th Cir. 2004) ("Compaq acted reasonably and quickly in investigating the situation and fired [the harasser] within three weeks after the harassment was reported."); Casiano v. AT&T Corp., 213 F.3d 278, 286 (5th Cir. 2000) ("AT&T responded promptly and effectively:  It suspended . . . the accused harasser, and . . . conduct[ed] an in-depth investigation . . . .")); Wyatt v. Hunt Plywood Co., 297 F.3d 405, 414 (5th Cir. 2002)  (Plaintiff reported sexual harassment by her supervisor,

Thompson, to his supervisor, Gorum, who said that he would talk to Thompson. "[I]f any remedial action were taken by Gorum, it was wholly ineffectual: Thompson's harassment of Wyatt continued unabated."). Nairn has not produced sufficient evidence to show that it met the first prong of the Ellerth/Faragher defense.

Defendant also fails to satisfy the second prong of its defense. Although plaintiff attended the employee meeting called by Pavlovich and was aware of the generic anti-discrimination policy that Pavlovich described, there is no evidence that Alkhawaldeh knew of a specific procedure for reporting future harassment, or that such a procedure even existed. In the absence of evidence of such a procedure, material fact issues are in dispute whether Alkhawaldeh unreasonably failed to take advantage of any preventive or corrective opportunities provided by Nairn when incidents of alleged harassment occurred after Klotz was compelled to apologize.

Accordingly, defendant's summary judgment motion on plaintiff's hostile work environment discrimination claim is denied.

### 3. Discriminatory termination claim

To the extent that Alkhawaldeh claims that his termination was based on his religion and/or national origin, Nairn has met its burden to produce legitimate, non-discriminatory reasons for firing him. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." McCoy, 492 F.3d at 557 (citation omitted). Defendant has introduced competent summary judgment evidence

that Alkhawaldeh was terminated because of his failure to perform job tasks assigned to him and his less than adequate recent job performance.  The burden of persuasion therefore shifts to plaintiff.

Alkhawaldeh must "'offer sufficient evidence to create a genuine issue of material fact either (1) that [defendant's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [defendant's] reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is [plaintiff's] protected characteristic (mixed-motives alternative).'"  Scott v. Weber Aircraft, No. 14-40171, 2015 WL 1746462, at *2 (5th Cir. Apr. 17, 2015) (quoting Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004)).

The pretext alternative incorporates "the traditional standard of but-for causation" and is more stringent than the mixed motives alternative.  Equal Emp'mt Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc., No. 14-86, 2015 WL 2464053, at *3 (U.S. June 1, 2015) (citing Univ. of Tex. Sw Med. Ctr. v . Nassar, 133 S. Ct. 2517 (2013)).  Title VII's "disparate-treatment provision prohibits actions taken with the motive of" discrimination on the basis of a protected characteristic.  Id. at *4.

Under the pretext route, plaintiff must show

that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose.  The plaintiff may do so either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence, meaning that the explanation is not the real reason for the adverse employment action.

Anderson v. McDonald's Restaurants of La., Inc., No. 11-992, 2012 WL 5878731, at *4 (E.D. La. Nov. 21, 2012) (quotations omitted) (emphasis added) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); McCoy, 492 F.3d at 557; Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003)).

Nairn asserted the mixed motives defense in its answer to plaintiff's complaint. "To satisfy the mixed-motive theory, a plaintiff need only demonstrate that her protected characteristic was one factor in the company's [adverse employment] decision . . . . The company then must establish that the same adverse employment decision would have been made regardless of discriminatory intent." Criner v. Tex.-N.M. Power Co., 470 F. App'x 364, 369 n.2 (5th Cir. 2012) (citing Keelan v. Majesco Software, Inc., 407 F.3d 332 340-41 (5th Cir. 2005)).

> [A] mixed-motive defense could be established in Title VII cases . . . where the employer presents objective proof that it would have made the same employment decision had it not taken into account the prohibited factor. Moreover, the legitimate reason must have been present at the time the decision was made. And, it is not enough for the employer to show that the same decision would have been justified; the employer must show that its legitimate reason would have produced the same decision standing alone.

Piatt v. City of Austin, 435 F. App'x 408,  411-12 (5th Cir. 2011) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 252 (1989)).

Alkhawaldeh has proffered evidence sufficient to create material fact disputes that Nairn's asserted reasons are either pretexts for discrimination because they are not credible or that, if the reasons are true, his religion and/or national origin was also a

motivating factor in the decision to terminate his employment.  That evidence includes, but is not limited to, the following.  Klotz was a demonstrated bigot and harasser. Klotz's forced apology letter is not in the record, making its contents unknown and its sincerity subject to question.  DeMatteo appears to have abetted Klotz's prejudice when DeMatteo participated in the conversation calling Arabs and Muslims "stupid," and when he told Klotz that it was either "him or Ratib in this company."  Although Nairn now relies on plaintiff's record of past accidents as a motive for firing him, that reason was not given at the time.  The suspiciously unsigned disciplinary warning regarding the April 2011 accident in Alkhawaldeh's personnel file raises a question about defendant's motives.  Nairn also alleges that Alkhawaldeh was fired because he refused to grease the stacker, which was one of his duties and a duty of all front end loader operators. However, plaintiff testified that greasing the stacker had never been one of his duties and that his immediate supervisor had explained that to Klotz.  Nairn's Disciplinary Action and Separation Notices state that Alkhawaldeh was fired because of his failure to perform job tasks "as agreed to" on July 5, 2011, but that earlier disciplinary warning was for failure to properly maintain equipment and did not mention greasing the stacker.

The totality of the evidence, viewed in the light most favorable to Alkhawaldeh, could be viewed by a reasonable jury as Klotz creating a false record to justify eventual termination of plaintiff on discriminatory grounds.  Plaintiff has met his burden to demonstrate a material fact issue as to pretext or that discrimination was at least a

41

motivating factor in Nairn's decision.  Defendant has failed to carry its burden to

establish that it would have made the same decision had it not taken the prohibited factor

into account.  Resolving conflicts in and deciding the weight and credibility of this

evidence must be done by the jury at trial, not by the court on summary judgment.

Accordingly, defendant's summary judgment motion is denied as to plaintiff's

claim of discriminatory termination.

4.    Retaliation claim

To meet his summary judgment burden to demonstrate a material fact issue

regarding his claim that his termination was in retaliation for having complained about

discrimination, Alkhawaldeh must provide evidence to

> establish that:  (1) he participated in an activity protected by Title VII;
> (2) his employer took an adverse employment action against him; and (3) a
> causal connection exists between the protected activity and the adverse
> employment action. . . .  If the employee establishes a prima facie case, the
> burden shifts to the employer to state a legitimate, non-retaliatory reason
> for its decision.  After the employer states its reason, the burden shifts back
> to the employee to demonstrate that the employer's reason is actually a
> pretext for retaliation.
>     An employee establishes pretext by showing that the adverse action
> would not have occurred "but for" the employer's retaliatory reason for the
> action.  In order to avoid summary judgment, the plaintiff must show a
> conflict in substantial evidence on the question of whether the employer
> would not have taken the action "but for" the protected activity.

Coleman v. Jason Pharm., 540 F. App'x 302, 303-04 (5th Cir. 2013) (quotations omitted)

(citing Nassar, 133 S. Ct. at 2533-34; McDonnell Douglas, 411 U.S. at 802; McCoy, 492

F.3d at 556-57; LeMaire v. Louisiana, 480 F.3d 383, 388-89 (5th Cir. 2007); Long v.

Eastfield Coll., 88 F.3d 300, 308 (5th Cir. 1996)); accord Feist v. La. Dep't of Justice, 730 F.3d 450, 454 (5th Cir. 2013).

For purposes of defendant's summary judgment motion, it is undisputed that Alkhawaldeh complained to Nairn's management about the August 2010 video incident, which is activity protected by Title VII. Amanduron v. Am. Airlines, 416 F. App'x 421, 424 (5th Cir. 2011) (citing Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2009); Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 626 (5th Cir. 2008); Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002)). It is also undisputed that termination is an adverse employment action as defined by the case law on retaliation. Although Nairn argues that Alkhawaldeh has no evidence to show the causal connection necessary to establish the third prong of his prima facie case, defendant actually focuses on plaintiff's alleged inability to carry his ultimate burden to prove "but for" causation. The court therefore assumes without deciding that plaintiff could establish a prima facie case and turns to the next step of the burden-shifting analysis.

As previously stated, Nairn has produced evidence of its legitimate reasons for terminating plaintiff. Defendant's evidence, if believed by the trier of fact, establishes legitimate non-retaliatory reasons for the termination. The burden therefore shifts back to Alkhawaldeh to demonstrate a material fact issue that defendant's reasons were actually a pretext for retaliation because he had engaged in activity protected by Title VII or, stated another way, that retaliation was the "but for" cause of his termination.

43

The same evidence previously described with respect to plaintiff's discriminatory termination and hostile work environment claims also creates material fact issues as to his retaliatory termination claim.  The credibility of defendant's reasons for terminating Alkhawaldeh require a trial on this claim.

Accordingly, defendant's motion for summary judgment is denied as to plaintiff's retaliation claim.

<u>CONCLUSION</u>

For all of the foregoing reasons, **IT IS ORDERED** that defendant's motion for summary judgment is GRANTED IN PART as to his claim of discrimination based on being ordered to grease the stacker, and that claim is DISMISSED WITH PREJUDICE. The motion is otherwise denied.  Jury selection will commence as scheduled on June 22, 2015 at 8:30 a.m.

New Orleans, Louisiana, this _____2nd_____ day of June, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE